**UNITED STATES DISTRICT COURT**

Northern District of California

| | |
|---|---|
| GREGORY L. SULLIVAN and KOJI FUJITA, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF SAN RAFAEL, a government entity; SAN RAFAEL POLICE DEPARTMENT, a government entity; RYAN DEMARTA, individually, and in his capacity as police officer for CITY OF SAN RAFAEL; RYAN COGBILL, individually, and in his capacity as police officer for the CITY OF SAN RAFAEL; and DOES 1 to 50, <br><br> Defendants.. <br> _____/ | No. C 12-1922 MEJ <br><br> **ORDER RE DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. NO. 28)** |

## INTRODUCTION

Plaintiffs Gregory L. Sullivan and Koji Fujita ("Plaintiffs') filed a civil rights action under 42 U.S.C. § 1983 claiming that they suffered constitutional violations committed by the City of San Rafael, the San Rafael Police Department, and two police officers (collectively "Defendants"). The individual defendants are Officer Ryan Demarta and Corporal Ryan Cogbill. Before the court is Plaintiffs' Motion for Partial Summary Judgment, in which Plaintiffs move for summary judgment on the U.S.C. § 1983 claim against Officer Demarta for violation of their Fourth Amendment rights to be free from unreasonable searches and seizures. Dkt. No. 28. For the following reasons, the motion is DENIED.

## BACKGROUND

The following facts are taken from the parties' Joint Statement of Undisputed Facts ("JSUF"). Dkt. No. 44. The incident giving rise to this action took place on June 1, 2011 at Plaintiffs' home at 315 Paloma Avenue, San Rafael, California. JSUF 1. At 23:32 hours (11:32 p.m.), the San Rafael

Police Department ("SRPD") dispatched Corporal Cogbill and Officer Demarta to the 300 block of Paloma Avenue based on a complaint from a neighbor about Mr. Sullivan. JSUF 2. The SRPD dispatch communicated the following information to Corporal Cogbill and Officer Demarta via radio: "K11, if you can cover on a suspicious search and contact an RP at 314 Paloma. He says his neighbor across the street is drunk and was yelling at him because his dog ran across the street at 315 Paloma. Said the subject was waving something in his hand that looked like a gun but he is not sure." JSUF 3.

Officer Demarta stated in his report that he had been called out on a "possible man with a gun call." JSUF 4. Prior to contacting Mr. Sullivan, SRPD dispatch advised Corporal Cogbill and Officer Demarta that Mr. Sullivan was "negative guns," meaning that Mr. Sullivan did not have any registered firearms. JSUF 5.

Officer Demarta and Corporal Cogbill arrived on scene separately and in different vehicles. JSUF 6. When Officer Demarta arrived on scene, Corporal Cogbill was already at the neighbor's house and asked Officer Demarta, via radio, to contact Mr. Sullivan at his home across the street from where Corporal Cogbill was located. JSUF 7. The CAD recording of the conversation between Officer Demarta and Corporal Cogbill prior to Officer Demarta contacting Mr. Sullivan captured no information being exchanged related to any allegation of a criminal threat by the neighbor. JSUF 8. At Sullivan's preliminary hearing, Officer Demarta testified that upon his arrival on scene, and before Officer Demarta contacted Sullivan, Corporal Cogbill also advised him that Sullivan threatened to kill Mr. Clar: "Later, prior to me contacting Mr. Sullivan, I spoke to Officer Cogbill, and he told me that the resident at 315 had threatened to kill Mr. Clar." JSUF 9.

Prior to Officer Demarta contacting Mr. Sullivan, the police dispatcher relayed the information to Officer Demarta via radio that Mr. Sullivan was "clear Code 6, valid, negative guns." JSUF 10. Officer Demarta's report did not state whether or not he spoke with Corporal Cogbill about the criminal threats allegations prior to contacting Mr. Sullivan. JSUF 11. Officer Demarta's report states, in part: "On 6/01/2011, at approximately 2332 hours, I was dispatched to [address redacted] regarding a possible man with a gun call. Corporal Cogbill told me via radio to contact the resident at

UNITED STATES DISTRICT COURT
For the Northern District of California

[address redacted]. As I walked to the front door the door opened and a male, later identified as Gregory Sullivan opened the door and stepped outside." JSUF 12.

Corporal Cogbill's report states in part, "During the time that I was interviewing [name redacted], Officer Demarta arrived on scene. I told him to make contact with the two men that were in the driveway of 315 Paloma Avenue. He advised me that the men were actually in front of 309 Paloma Avenue. I told him to disregard contacting them and to make contact at 315 Paloma Avenue." JSUF 13. Corporal Cogbill's report states that he concluded the interview with the neighbor inside the neighbor's house, walked outside, and could hear Officer Demarta "talking to someone in the doorway of 315 Paloma Avenue. (The person that he was talking to was identified as Greg Sullivan.)" JSUF 14.

Upon arriving at the 300 block of Paloma Avenue, Officer Demarta had exited his patrol car and approached Mr. Sullivan's residence at 315 Paloma Ave. JSUF 15. In his police report, Officer Demarta stated that Mr. Sullivan opened his front door and stepped outside. JSUF 16. Officer Demarta believed Mr. Sullivan displayed objective signs of being under the influence of alcohol. JSUF 17. Officer Demarta asked Mr. Sullivan if he was having a problem with his neighbor and Mr. Sullivan responded "No." JSUF 18. Officer Demarta asked Mr. Sullivan if he had been outside earlier and Mr. Sullivan responded "No." JSUF 19. Officer Demarta informed Mr. Sullivan that the neighbor had reported him to be "outside waving a gun around" and Mr. Sullivan laughed. JSUF 20. Officer Demarta asked Mr. Sullivan if he had problems with his neighbors and Mr. Sullivan said "No." JSUF 21. Mr. Sullivan told Officer Demarta there was a problem with his neighbor's dog being on his property. JSUF 22.

Officer Demarta testified at the preliminary hearing that because he was responding to reports of a man with a gun, for officer safety and public safety, Officer Demarta wanted to search Sullivan to make sure he did not have a weapon on him. JSUF 23. Officer Demarta told Sullivan that he needed to search him for weapons, Sullivan took a few steps back and went inside the house, but the door was still open. JSUF 24. At the preliminary hearing, officer Demarta testified that he told Sullivan again that he needed to search him for weapons, but Sullivan said "Fuck you." JSUF 25. In

his police report, Officer Demarta stated that he placed his right foot inside the doorway "to prevent Sullivan from closing the door." JSUF 26.  In his police report, Officer Demarta states that Mr. Sullivan started yelling at Officer Demarta "to get out of his house,"and yelled "Fuck you." JSUF 27.

After discussing the matter with the reporting party, Corporal Cogbill walked to Mr. Sullivan's front yard and heard officer DeMarta say something to the effect of "Sir, can you step outside so that I can make sure that you don't have a gun. We got a report of a gun and for your safety I want to sure that you don't have a gun." JSUF 28.  At the time, Officer Demarta told Mr. Sullivan he needed to check him for weapons and that if he did not step outside that he would have to come inside. Sullivan then started to walk further into the house.  JSUF 29.

As Corporal Cogbill got closer, he could see Officer Demarta standing on Mr. Sullivan's front porch and the front door to Mr. Sullivan's residence was open.  JSUF 30.  Corporal Cogbill next heard a male voice say something similar to "Fuck you, this is my house, get the fuck out of here." JSUF 31.  Corporal Cogbill saw that Officer Demarta was talking to someone in the doorway of Mr. Sullivan's house.  JSUF 32.  Corporal Cogbill heard Officer Demarta repeat himself again, but he added something similar to, "Don't go into your house, I don't know if you have a gun or not. I will have to follow you inside." JSUF 33.

Officer Demarta then entered Mr. Sullivan's house very quickly and told Mr. Sullivan to "Stop, do not go to the back of your house." JSUF 34.  Officer Demarta stated in his report that he decided to enter into Mr. Sullivan's house without Mr. Sullivan's consent as follows: "I decided to enter the house for the following reasons: I thought that Sullivan was going into his house to get a gun. I told Sullivan to come outside so I could check him for weapons and he disobeyed my commands. I also thought that if I did not go inside after Sullivan that he might come out later with a gun and go over to his neighbors. I also thought Sullivan could possibly barricade himself inside this house with a gun." JSUF 35.

At the preliminary hearing in the criminal matter of *The People of the State of California v. Gregory Lawrence Sullivan*, Marin County Case No. SC176088A (the "Preliminary Hearing") Officer Demarta testified he needed to search Sullivan for weapons as follows:

> Q: Why did you need to do that?
>
> …
>
> A: Okay. So at that point, being the fact that I was at a call for a man with a gun, I was told by Corporal Cogbill that that was the subject who had the gun.
> For officer safety and Public safety, I wanted to search him to make sure he didn't have [sic] weapon on him.
>
> (Osman Decl., Exhibit A, Prel. Hrg. Transcript 34:26-35:13.)
>
> ---
>
> Q: Why did you do that?
>
> A: Based on the fact, again, that there was a – I was there for a man with a gun call. I had identified myself, told him the reason I was there, told him that I just needed to search him to make sure he didn't have a gun. He wasn't complying with any of my demands. My thought was that a reasonable person would let me search them and see if they had a gun on them. He would not, so at that point –
>
> Q: Were you concerned about your safety?
>
> A: Yes, I was concerned about my safety and the safety of others.
>
> Q: Were you concerned about the safety of Mr. Clar?
>
> A: Yes.
>
> (Osman Decl., Exhibit A, Prel. Hrg. Transcript 35:25-36:10.)
>
> ---
>
> Q: Now, you decided to enter the house because you thought Mr. Sullivan was going to get a gun?
>
> A: Or he had a gun. I had no clue if he had a gun, or if he was going to go get a gun.
>
> Q: So you entered the house because you thought he either had a gun on his person or was going to get a gun
>
> A: In exigency, yes.
>
> (Osman Decl., Exhibit A, Prel. Hrg. Transcript 39:11-17.)

JSUF 36.

Officer Demarta testified at the Preliminary Hearing that he was concerned that Mr. Sullivan would destroy any evidence if he immediately did not enter the house without a warrant. JSUF 37.

5

After Officer Demarta followed Mr. Sullivan into Mr. Sullivan and Mr. Fujita's residence and into the living room, Mr. Sullivan continued to stand in his living room and turned to face Officer Demarta. JSUF 38. Corporal Cogbill also had entered Mr. Sullivan and Mr. Fujita's home without a warrant. JSUF 39. While Mr. Sullivan had his back towards the couch, Officer Demarta told him to sit down. JSUF 40. Mr. Sullivan started yelling "Fuck you, get the fuck out of my house, what are you doing in my house" and appeared very agitated. JSUF 40. Officer Demarta then unholstered his Electronic Control Device, or Taser ("TASER"), aimed it at Sullivan's chest, and told Sullivan to "Stop." JSUF 41. Mr. Sullivan then turned away and headed towards the hallway; when Officer Demarta told him to stop, he kept heading down the hallway. JSUF 42. Officer Demarta was concerned for his safety and concerned that Mr. Sullivan was going for a gun. JSUF 43. Officer Demarta – approximately five feet from Mr. Sullivan – shot him in the back with his TASER. JSUF 44. Mr. Sullivan stopped and yelled, but continued walking down the hallway and head into a bedroom. JSUF 45. Officer Demarta yelled for Mr. Sullivan to stop, but Sullivan kept walking away. JSUF 46. In his police report, Officer Demarta stated that he reactivated his TASER, but it had little effect. JSUF 47.

    As the officers followed behind as Mr. Sullivan entered his bedroom, they still were concerned he was going for a gun or a weapon. JSUF 48. Mr. Sullivan continued retreating from Officer Demarta, went into a bedroom and fell onto a bed where Mr. Fujita was sleeping. JSUF 49. Mr. Sullivan continued moving around the bed on his stomach. JSUF 50. When Officer Demarta told him to stop, Mr. Sullivan tried to stand up. JSUF 50. Mr. Sullivan was on his back on the bed with his feet in the air when Officer Demarta shot Mr. Sullivan with his TASER for the third time. JSUF 51.

    After Officer Demarta had entered Mr. Sullivan's home without a warrant, activated his TASER against Mr. Sullivan 3 times, and handcuffed Mr. Sullivan, he informed Mr. Sullivan that he was "not under arrest but he was being detained." JSUF 52. Later, at the October 26, 2011 Preliminary Hearing, Officer Demarta testified that after handcuffing Mr. Sullivan on the bed inside Plaintiffs' home that "I told him at that time he was being detained; he wasn't under arrest." JSUF

53. After Officer Demarta spoke with Corporal Cogbill about Corporal Cogbill's conversation with the complaining neighbor, Officer Demarta arrested Mr. Sullivan. JSUF 54. At the time Officer Demarta placed Mr. Sullivan under arrest, he explained to Mr. Sullivan "that he was under arrest for resisting and obstructing a police officer." JSUF 55. At the October 26, 2011 Preliminary Hearing, Officer Demarta testified that after receiving information from Corporal Cogbill, he arrested Mr. Sullivan for criminal threats and resisting and obstructing a police officer. JSUF 56.

On April 18, 2012, Plaintiffs filed their initial Complaint, alleging the following claims based on the actions taken by Defendants during the subject incident: (1) unlawful entry, false arrest, and excessive force under 42 U.S.C. § 1983 ("Section 1983") against the Officers; (2) unlawful entry, false arrest, and excessive force under Section 1983 against the City; (3) retaliation for protected speech under Section 1983 against the Officers; (4) retaliation for protected speech under Section 1983 against the City; (5) assault and battery; (6) false arrest and imprisonment; (7) intentional infliction of emotional distress ("IIED"); (8) negligent infliction of emotional distress ("NIED"); (9) violation of California Civil Code § 51.7 ("Section 51.7"); (10) violation of California Civil Code § 52.1 ("Section 52.1"); and (11) negligence. Dkt. No. 1. On May 11, 2012, Defendants filed a Motion to Dismiss, which the Court granted in part and denied in part. Dkt. Nos. 4, 18.

On August 22, 2012, Plaintiffs filed their First Amended Complaint, in which they allege the following claims: (1) unlawful entry, false arrest, and excessive force under Section 1983; (2) municipal liability under Section 1983; (3) assault and battery; (4) false arrest and imprisonment; and (5) intentional infliction of emotional distress; (6) negligent infliction of emotional distress; (7) negligence; and (8) violation of California Civil Code section 52.1. Dkt. No. 19.

Plaintiffs filed the present Motion for Partial Summary Judgment on February 7, 2013. Dkt. No. 28. In their Motion, Plaintiffs seek a determination that Officer Demarta violated Plaintiffs' rights to be free from an unlawful, warrantless entry into their home, as guaranteed by the Fourth Amendment to the United States Constitution. Pursuant to Federal Rule of Civil Procedure 78(b) and Civil Local Rule 7-1(b), the Court found this matter suitable for disposition without oral argument and vacated the April 4 hearing. Dkt. No. 46.

## LEGAL STANDARD

A court shall grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden of establishing the absence of a genuine issue of material fact lies with the moving party, *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986), and the court must view the evidence in the light most favorable to the non-movant. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986) (citation omitted). A genuine factual issue exists if, taking into account the burdens of production and proof that would be required at trial, sufficient evidence favors the non-movant such that a reasonable jury could return a verdict in that party's favor. *Id.* at 248. The court may not weigh the evidence, assess the credibility of witnesses, or resolve issues of fact. *Id.* at 249.

To defeat summary judgment once the moving party has met its burden, the nonmoving party may not simply rely on the pleadings, but must produce significant probative evidence, by affidavit or as otherwise provided by Federal Rule of Civil Procedure 56, supporting the claim that a genuine issue of material fact exists. *TW Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir. 1987). In other words, there must exist more than "a scintilla of evidence" to support the non-moving party's claims, *Anderson,* 477 U.S. at 252; conclusory assertions will not suffice. *Thornhill Publ'g Co. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979).

"The determination of whether a reasonable officer could have believed his conduct was lawful is a determination of law that can be decided on summary judgment only if the material facts are undisputed." *LaLonde v. Cnty. of Riverside,* 204 F.3d 947, 953 (9th Cir. 2000) (citing *Act Up!/Portland v. Bagley,* 988 F.2d 868, 873 (9th Cir.1993)).

## ANALYSIS

Plaintiffs argue that they are entitled to summary judgment as a matter of law on their claim that Officer Demarta unlawfully entered their home without consent, and no emergency or exigent circumstances justified his warrantless entry. Defendants contend that summary judgment is inappropriate because there existed sufficient emergency or exigent circumstances supporting the entry, based on Officer Demarta's knowledge of Mr. Sullivan's prior criminal threats to his neighbor

in conjunction with the CAD report that Mr. Sullivan brandished a gun, and Mr. Sullivan's subsequent inappropriate and unpredictable responses during Officer Demarta's initial investigation.

A plaintiff asserting a claim under Section 1983 must demonstrate that the action (1) occurred "under color of state law," and (2) resulted in the deprivation of a constitutional or federal statutory right. *Leer v. Murphy,* 844 F.2d 628, 632–33 (9th Cir.1988) (citations omitted). The parties dispute whether Defendants violated Plaintiffs' Fourth Amendment rights and whether Officer Demarta is entitled to qualified immunity. Plaintiffs, as the moving party, bear the initial burden on summary judgment of pointing out "an absence of evidence to support [Defendants'] case." *Celotex,* 477 U.S. at 325. Plaintiffs also bear the burden of proving that Defendants are not entitled to qualified immunity. *Moreno v. Baca,* 431 F.3d 633, 638 (9th Cir. 2005).

The Fourth Amendment generally prohibits warrantless entry of a person's home, whether to make an arrest or to conduct a search, unless an exception to the warrant requirement, such as consent, emergency, or exigency, applies. *Espinosa v. City and Cnty. of San Francisco,* 598 F.3d 528, 533 (9th Cir. 2010). Exceptions are "narrow and their boundaries are rigorously guarded to prevent any expansion that would unduly interfere with the sanctity of the home." *Hopkins v. Bonvicino,* 573 F.3d 573, 763 (9th Cir. 2009) (citation and internal quotation marks omitted). Defendants argue that Officer Demarta's warrantless entry into Mr. Sullivan's home was justified on the basis of the emergency exception or, in the alternative, the exigency exception. As discussed below, the Court finds that summary judgment is not appropriate because there is a disputed issue of material fact as to what the officer knew when he first contacted Sullivan.

**A. Emergency Exception**

Under the emergency exception, an officer may enter a home without a warrant to investigate an emergency that threatens life or limb if the officer has objectively reasonable grounds to believe that an emergency exists and that his immediate response is needed. *Espinosa*, 598 F.3d at 534 (citing *Hopkins v. Bonvicino* 573 F.3d 752, 763-64 (9th Cir. 2009)). This exception is derived from police officer' community caretaking function, allowing them to enter a home when an emergency which threatens physical harm is presented. *Id.* at 763. An

9

1 action is "'reasonable' under the Fourth Amendment, regardless of the individual officer's state
2 of mind, 'as long as the circumstances, viewed *objectively,* justify [the] action.'" *Brigham City,*
3 *Utah v. Stewart*, 547 U.S. 398, 404 (2006) (quoting *Scott v. United States,* 436 U.S. 128, 138
4 (1978) (emphasis added in *Brigham City*).

5       Here, Plaintiffs assert that before Officer Demarta entered their home, he had no
6 objectively reasonable basis to fear for his safety or the safety of others, and that these facts are
7 undisputed. According to Plaintiffs, the only facts known to the officer were: (1) dispatch had
8 relayed that Mr. Sullivan's neighbor Clar had reported he was drunk, yelling about a dog on his
9 property, and waving something that might have been a gun but he was not sure (JSUF 3); (2)
10 dispatch communication that Mr. Sullivan had no guns registered to him (JSUF 5); (3) Mr.
11 Sullivan opened the door when Officer Demarta approached (JSUF 6); (4) Officer Demarta did
12 not observe a visible weapon (JSUF 23, 33); (5) Mr. Sullivan appeared to be under the influence
13 of alcohol (JSUF 17); (6) Mr. Sullivan denied having a problem with Clar and laughed when
14 told of the report he was seen outside waving a gun around (JSUF 18); (7) Mr. Sullivan denied
15 being outside earlier or having problems with Clar, but stated he had a problem with Clar's dog
16 being on his property (JSUF 19-22); and (8) Mr. Sullivan refused to voluntarily step outside his
17 house to be searched for weapons and tried to close the front door to end the interview (JSUF
18 24-29).

19       However, Officer Demarta's version of the facts stands in direct conflict to that of
20 Plaintiffs in one important respect: he asserts that he was told Mr. Sullivan had threatened to kill
21 Clar before he contacted him at the front door. JSUF 9. Officer Demarta asserts that he
22 objectively believed, based on the totality of the circumstances, that Mr. Sullivan was either
23 about to get a gun, or might come back outside with a gun and harm the officers or his neighbor.
24 JSUF 35; *see United States v. Al-Azzawy*, 784 F.2d 890, 894 (9th Cir. 1985). The Court thus
25 finds there to be a genuine issue of material fact as to whether the emergency exception justified
26 Officer Demarta's warrantless entry. A reasonable jury could credit Mr. Sullivan's version of
27 the facts over Officer Demarta's, negating a finding that the warrantless entry was supported by
28

emergency. Conversely, if a jury believes Officer Demarta's version of the facts, the entry would be justified under this exception, because the officer had an objectively reasonable belief that physical harm was imminent. Accordingly, the Court cannot grant summary judgment on this claim at this stage in the proceedings. *LaLonde*, 204 F.3d at 953 (citing *Act Up!/Portland,* 988 F.2d at 873).

### B. Exigency Exception

The exigency exception "derive[s] from the police officers' investigatory function; it allows them to enter a home without a warrant if they have both probable cause to believe that a crime has been or is being committed and a reasonable belief that their entry is necessary to prevent the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *Id.* (internal quotation and alteration marks omitted). The Supreme Court recently reiterated that "reasonableness 'must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight' and that '[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving.'" *Ryburn v. Huff,* ––– U.S. –––, 132 S.Ct. 987, 992 (2012) (per curiam) (alteration in original) (quoting *Graham,* 490 U.S. 386, 396-97).

An exigency related to a misdemeanor will seldom, if ever, justify a warrantless entry into the home. *Welsh v. Wisconsin,* 466 U.S. 740, 752-53 (1984). The burden to show exigent circumstances rests on the officer, who must "point [ ] to some real immediate and serious consequences if he postponed action to get a warrant." *Sims v. Stanton,* 706 F.3d 954 (9th Cir. 2013) (quoting *Welsh v. Wisconsin,* 466 U.S. 740, 749-50, 751 (1984) (internal quotation marks and citation omitted)). Plaintiffs assert that *Sims* is analogous to their case because, based on their version of the facts, Officer Demarta could only have suspected Mr. Sullivan of the misdemeanor crime of resisting an officer's command to be searched, and on that basis alone pursued him into his home. But once again, Plaintiffs have failed to establish that there are no disputed material facts. Defendants contend that in addition to Plaintiffs' version of the facts, Officer Demarta also knew before contacting

11

Sullivan that he had threatened to kill his neighbor, which, if believed, provides an objectively reasonable basis for the officer's fear that further violence was imminent if he did not make sure Mr. Sullivan was unarmed. In *Sims*, the court gave the following examples of objectively reasonable bases for fearing violence was imminent that would justify warrantless entry under the exigency exception: particularized suspicion that a suspect would "engage [the officer], return with a weapon, or otherwise threaten [the officer] with violence." *Sims*, at 16-17, 18-19. The facts supporting these factors are clearly in dispute.

The Court thus concludes that there is a genuine dispute of material fact as to whether exigent circumstances justified Officer Demarta's entrance into Plaintiffs' home. If a reasonable jury believes Mr. Sullivan's version of the events rather than that of Officer Demarta, such a finding would negate the exigent circumstances required to permit the officer to lawfully enter Plaintiffs' home. Conversely, if a jury accepted Officer Demarta's version of the facts, exigent circumstances would justify the officer's entry. As the Court cannot determine whether the warrantless entry complied with the Fourth Amendment, it also cannot determine whether the officer is entitled to qualified immunity based on these facts. "A trial court should not grant summary judgment when there is a genuine dispute as to 'the facts and circumstances within an officer's knowledge' or 'what the officer and claimant did or failed to do.'" *Hernandez v. City of Napa*, 781 F.Supp.2d 975, 989 (N.D. Cal. 2011) (citing *Hopkins,* 573 F.3d at 762-63. \

## CONCLUSION

Based upon the analysis above, Plaintiffs' Motion for Partial Summary Judgment is DENIED.

**IT IS SO ORDERED.**

Dated: April 18, 2013

_____
Maria-Elena James
United States Magistrate Judge